UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

Thomas B. Ireland, as
personal representative of
the estate of Gregg T. Ireland,

Civ. No. 2:17-468-FtM-PAM-MRM

Plaintiff,

v.

**MEMORANDUM AND ORDER**

Bill Prummell, Corizon LLC,
Tabbatha Carter, Brandon
Swartzentruber, Michael Wiles,
Robert Sledzindski, Alan Swocho
William Garlick, Michael Burnette,
Albert L. Burrows, Adamar
Gonzalez-Figueroa, Margaret
Bracy, and Zackary Heavener,

Defendants.

This matter is before the Court on Defendants' Motions for Summary Judgment. For the following reasons, the Motions are granted.

**BACKGROUND**

On August 22, 2015, Gregg Ireland was arrested for driving under the influence. (Am. Compl. (Docket No. 27) ¶ 21.) Because Ireland's breath test revealed an alarmingly high level of alcohol, the arresting deputies took him to the hospital. (Id. ¶ 23.) Two hours later, the hospital released him with a prescription for potassium chloride due to a diagnosis of hypokalemia, which is a low blood potassium level associated with alcohol withdrawal. (Id. ¶¶ 24-26.) The deputies then took Ireland to the Charlotte County Jail. Ireland was never given the prescribed potassium chloride. (Heavener Dep. (Docket No. 86-5) at 15.)

The jail did not perform a medical intake or screening of Ireland until more than 5 hours after he arrived at the facility. (Jail Intake Form (Docket No. 83-2) at 1.) The nurse performing the screening did not have Ireland's hospital records, and thus did not see the prescription or that Ireland had been diagnosed as a chronic alcoholic. (Id.) Ireland was assigned to the medical unit so staff could monitor him for alcohol withdrawal. (See id. at 8-9.) And he was in fact monitored, with jail medical staff noting no withdrawal symptoms through 9:00 pm on August 23. (Id. at 9.)

On August 23, a nurse informed the on-call physician, Defendant Gonzalez, of the hospital's recommendation that Ireland take potassium. (Gonzalez Dep. (Docket No. 83-2) at 52-53; Heavener Dep. at 22.) Gonzalez ordered a blood test to determine whether potassium was necessary. (Gonzalez Dep. at 52-53.) That test was scheduled for August 24.

In the early morning hours of August 24, however, Ireland became agitated and he and his cellmate got into an altercation of sorts. Corrections officers responding to the altercation ultimately tased Ireland multiple times, and punched and kicked him in an effort to force compliance with handcuffing. (Swartzentruber Rep. (Docket No. 86-3) at 1.) He was then moved to another cell for observation, but the camera in the cell did not work, so he was moved to another cell. (Sledzinski Rep. (Docket No. 86-9) at 2.) Plaintiff alleges that Ireland was unconscious at this point and was dragged to these various cells.

Because Ireland had been so agitated, the nurses on duty, Defendants Heavener and Bracy, attempted to contact Gonzalez but were unable to reach her. (Bracy Dep (Docket No. 86-2) at 35-36.) Eventually, they contacted another Corizon physician, who prescribed

valium. (Corizon's Supp. Mem. (Docket No. 84) at 4.) But shortly after Ireland was put into the second cell, he became unconscious, and the valium was never administered. Jail staff performed CPR and used an AED on him, and he was transported to the hospital. (Heavener Rep. (Docket No. 86-16).)

Doctors at the hospital discovered that Ireland had suffered cardiac arrest, and that he also had septic shock and multi-organ failure. (See Autopsy Rep. (Docket No. 86-13) at 1.) Ireland was removed from life support on August 25. Plaintiff contends that the failure to give Ireland potassium, combined with the tasings and beatings, led to the cardiac arrest. Defendants contend that Ireland suffered from severe liver and heart disease and was morbidly obese, and that these conditions led to Ireland's cardiac arrest.

Plaintiff Thomas Ireland is Gregg Ireland's father and personal representative of his estate. Named as Defendants here are Corizon, LLC, the jail's private healthcare provider, Adamar Gonzalez-Figueroa, the jail's physician, Margaret Bracy and Zackary Heavener, nurses at the jail, Bill Prummell, the Charlotte County Sheriff, Tabbatha Carter, the jail's Watch Commander, and six corrections officers, Brandon Swarzentruber, Michael Wiles, Robert Sledzinski, Alan Schwocho, William Garlick, and Albert Burrows.[1] Plaintiff Amended Complaint raises seven causes of action: three claims of a violation of 42 U.S.C. § 1983 for failure to treat against Corizon (Count I), Gonzalez (Count II), and Bracy and Heavener (Count III); a § 1983 deliberate-indifference claim against Sheriff Prummell (Count IV); a multifaceted § 1983 claim against the corrections officers (Count V); and

---

[1] Ireland's claims against another corrections officer, Michael Burnette, were dismissed by stipulation in October 2019. (Docket No. 80.)

two state-law claims for wrongful death against the Sheriff (Count VI) and Corizon (Count VII).

**DISCUSSION**

Summary judgment is proper only if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. Burton v. City of Belle Glade, 178 F.3d 1175, 1187 (11th Cir. 1999) (citation omitted).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. O'Ferrell v. United States, 253 F.3d 1257, 1265 (11th Cir. 2001). When opposing a motion for summary judgment, the nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). A party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials and "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (citation omitted).

**A.   Corrections Officers' Motion**

Ireland's § 1983 claim against the individual corrections officers alleges that they used excessive force on him, failed to intervene to prevent the excessive use of force, and interfered with Ireland's medical care.

4

Corrections officers, like police officers, are protected from suit for damages arising out of their discretionary duties "'as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated.'" Douglas Asphalt Co. v. Qore, Inc., 541 F.3d 1269, 1273 (11th Cir. 2008) (quoting Anderson v. Creighton, 483 U.S. 635, 638 (1987)). The purpose of this qualified immunity "is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation marks and citations omitted). To benefit from qualified immunity, the public official must first prove that he was acting pursuant to his discretionary authority. Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002). The burden then shifts to the plaintiff to establish that a constitutional violation occurred and that the constitutional right alleged was clearly established at the time of the violation. Id. There seems to be no dispute that the Defendant officers were acting pursuant to their discretionary authority. Defendants argue that they did not violate Ireland's constitutional rights and that, in any event, the right alleged was not clearly established at the time of the incident.

### 1. Excessive Force

"The Due Process Clause of the Fourteenth Amendment protects pretrial detainees . . . from the use of force that 'shocks the conscience,'" Skelly v. Okaloosa Cnty. Bd. of Cnty. Comm'rs, 456 F. App'x 845, 847 (11th Cir. 2012) (quoting Danley v. Allen, 540 F.3d 1298, 1306-07 (11th Cir. 2008)). As the Supreme Court has framed it, the inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or

5

maliciously and sadistically to cause harm." Wilkins v. Gaddy, 130 S. Ct. 1175, 1178 (2010). Indeed, qualified immunity will not protect an officer from liability for a proven claim of excessive force, because excessive force requires a showing of maliciousness that is "'so extreme that every conceivable set of circumstances in which this constitutional violation occurs is clearly established to be a violation of the Constitution.'" Skelly, 456 F. App'x at 847 (quoting Johnson v. Breeden, 280 F.3d 1308, 1321-22 (11th Cir. 2002)).

The inquiry is whether the use of force was objectively reasonable under the circumstances.

> [P]roper application [of the objective reasonableness standard] requires careful attention to the facts and circumstances of each particular case, including the severity of the [situation] at issue, whether the [individual] poses an immediate threat to the safety of the officers or others, and whether he is actively resisting . . . .

Graham v. Connor, 490 U.S. 386, 396 (1989) (citation omitted). These considerations should be made without regard for the officer's subjective intent or motivation. Id. at 397.

Swarzentruber was the first corrections officer to enter Ireland's cell on August 24. He did so in an attempt to retrieve Ireland's cellmate's belongings, including a plastic "boat" in which detainees sleep. He testified that Ireland refused repeated orders to sit down, and eventually "tensed up" and took a step towards Swarzentruber. (Heavener Dep. at 41.) In response, Swarzentruber deployed his taser. (Swarzentruber Report at 1.) When Ireland then failed to comply with commands to lie flat and put his hands behind his back, Swarzentruber tased him again. (Id.) Ireland removed one of the taser prongs and sat up into a kneeling position. (Id.) Other officers arrived in the cell, attempting to force Ireland

6

to the floor. (Id.) Swarzentruber tased him again, allowing the officers to get one of Ireland's hands in a handcuff. When he continued to prevent the officers from gaining control of his other arm, Swarzentruber tased him another time. (Id.)

Defendant Wiles sat on Ireland's back in an attempt to get him into restraints. Ireland lifted Wiles off the ground, and Wiles struck Ireland twice in the lower back. (Wiles Rep. (Docket No. 86-10) at 1.) Defendants assert that Ireland attempted to spit on Defendant Burrows and to bite Defendant Schwocho, who used an under-the-jaw pressure point to prevent Ireland from biting. (Sledzinski Rep. at 1.) Ireland continued fighting as the officers got his legs into shackles. (Id.) Defendant Sledzinski twice used the drive-stun function of his taser against Ireland during the shackling. (Id.)

Shortly before officers arrived in the cell with an emergency restraint belt, Ireland became unresponsive. (Id.) Defendant Bracy, the Corizon nurse, then attempted to get Ireland's vital signs, but he came to and kicked at and tried to strike the officers, preventing Bracy from examining him. (Bracy Dep. at 38.) Ireland then again attempted to spit on the officers, and they placed him in a spit mask. (Wiles Rep. at 1.) After securing the emergency restraint belt, the officers carried Ireland to a direct-observation cell. (Id. at 1-2.) Very soon thereafter, Ireland became unresponsive again, and CPR was performed until an ambulance arrived. (Id. at 2.)

Plaintiff's expert opined that all of Ireland's "resisting" can be explained by the fact that he was suffering severe alcohol withdrawal, which can include hallucinations and

7

delirium tremens (DT) seizures.² (Docket No. 83-4 at 32-33, 43.) Plaintiff cites the May 2019 statement of another inmate, who claims she heard the officers saying that Ireland was having a seizure,³ and one of the officers, who stated that Ireland was not hitting anyone but was "flailing" around "like a fish flopping." (Schwocho Rep. (Docket No. 94-3) at 4, 5, 10.) Moreover, Plaintiff points out that there were nine or ten officers in Ireland's cell, so that any seizure movement he made would have resulted in him touching at least one of the officers. Finally, Plaintiff alleges that Ireland was unresponsive before the officers moved him to the direct-observation cell, and he contends that the officers dropped Ireland several times while moving him to the direct-observation cell.

Plaintiff's claim is that the officers should have been trained to recognize the symptoms of severe alcohol withdrawal, specifically DT seizures and hallucinations. Had the officers been so trained, he contends, they would have known that Ireland was not resisting or trying to fight them, but was experiencing DT seizures, and they would not have used force on him.

But this is a failure-to-train claim, not a claim of excessive force. Plaintiff does not dispute the officers' accounts that Ireland was kicking and spitting and biting. Rather,

---

² Plaintiff contends that the autopsy report confirmed that Ireland was suffering from delirium, implying that the report states that Ireland was having DT seizures. But at most, the medical examiner interpreted incident reports as showing that the events began with Ireland experiencing "increasing agitation and delirium." (Autopsy Rep. at 9.) This is far from a finding that Ireland was suffering from DT seizures.

³ Defendants ask the Court to strike the evidence for Plaintiff's alleged failure to disclose it during discovery. Because this evidence does not change the Court's conclusion that Defendants are entitled to qualified immunity, the Court declines to strike the evidence.

Plaintiff contends that these actions were involuntary on Ireland's part because of the DT seizures and hallucinations and that the officers should have known that. In support, Plaintiff cites Lancaster v. Monroe Cty., 116 F.3d 1419 (1997), overruled on other grounds by LeFrere v. Quezada, 588 F.3d 1317 (11th Cir. 2009). In Lancaster, a detainee who was an alcoholic experienced DT seizures and ultimately died from an injury suffered while seizing. Id. at 1423. The Eleventh Circuit found that the officers on duty at the jail could be liable under § 1983 because they knew of the detainee's serious medical needs and were deliberately indifferent to those needs. Id. at 1425-26. But in Lancaster, the detainee's wife and father repeatedly warned jail staff that the detainee was a chronic alcoholic who would suffer a seizure as he withdrew from alcohol; indeed, they went to the jail to discuss the detainee's likely imminent seizures with staff. Id. at 1421-22. Because the officers knew of the detainee's serious medical needs and failed to provide for those needs, they were not entitled to qualified immunity. Id. at 1426-28.

Here, there is no evidence that any of the officers knew or even should have known of Ireland's chronic alcoholism, much less that he might suffer from DT seizures. The Court must review the situation initially from the perspective of a reasonable officer on the scene, and then individually, to determine whether any officer "had the requisite knowledge of the seriousness of [Ireland's] medical needs." Lancaster, 116 F.3d at 1426. A reasonable officer is not medically trained and would have viewed Ireland's undisputed actions as attempting to attack Swartzentruber, and then resisting the other officers' attempts to restrain him. Plaintiff has not established that the Defendant officers used constitutionally excessive force on Ireland.

9

Moreover, even if Swartzentruber and Schwocho, both of whom were on duty in the medical unit that evening, knew or should have known that Ireland was an alcoholic who was experiencing DT seizures, that knowledge cannot be imputed to the remaining Defendants, who arrived from other units after Swartzentruber reported the first use of his taser. Plaintiff's excessive-force claim against the officers is dismissed.

Plaintiff's claim that the Defendant officers failed to intervene to stop the allegedly excessive use of force fares no better. "[I]f a[n] [] officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence, the officer is directly liable under Section 1983." Ensley v. Soper, 142 F.3d 1402, 1407 (11th Cir. 1998) (quoting Byrd v. Clark, 783 F.2d 1002, 1007 (11th Cir. 1986)). But such a claim requires proof of excessive force in the first instance, and there was no such excessive force here. Sebastian v. Ortiz, 918 F.3d 1301, 1312 (11th Cir. 2019). Plaintiff's failure-to-intervene claim fails.

Plaintiff also bases his § 1983 claim on the officers' alleged interference with Ireland's medical care. This is akin to a deliberate-indifference claim: Plaintiff asserts that Defendant officers should have known of Ireland's serious medical needs but either did not allow him to be treated or delayed his treatment. According to Plaintiff's version of the events, Ireland was unresponsive at the time he was taken out of his original cell and moved to the direct-observation cell. Moreover, Plaintiff contends that Schwocho heard Ireland make "obnoxiously weird statements" at 11 p.m. and should have known then that Ireland needed medical care because he was beginning to experience DT.

But Plaintiff has no evidence that a reasonable officer in Schwocho's position, or in

the position of the other officers, would have known that Ireland needed medical care. Plaintiff offers only speculation: the officers allegedly knew that Corizon ostensibly understaffed the jail and performed ineffective intake, so they should have known that the intake form, which did not allude to Ireland's chronic alcoholism, was incorrect. Thus, they should have realized that Ireland was a chronic alcoholic who would likely experience DT. But the officers were far from deliberately indifferent to Ireland's medical needs, nor did they interfere in any way with his medical care. Indeed, they attempted to involve medical staff from the beginning of the incident. Nurse Heavener went to Ireland's cell with Swartzentruber and witnessed Ireland's aggressive stance toward Swartzentruber.

Although it is understandable that Plaintiff would like to change the circumstances surrounding his son's death, there is simply no evidence to support all of the speculative leaps his claim requires. Plaintiff's interference-with-medical-care claim fails.

**B. Sheriff's Motion**

**1. § 1983 Claim**

Plaintiff's § 1983 claim against Sheriff Prummell are brought against him in his official capacity only. (Am. Compl. ¶ 11.) Thus, it is as if Plaintiff is bringing suit against the municipal entity, Charlotte County. See Kentucky v. Graham, 473 U.S. 159, 165 (1985) (a suit against government officer in his official capacity is the same as a suit "against [the] entity of which [the] officer is an agent" (quoting Monell v. Dep't of Social Servs., 436 U.S. 658, 690 n.55 (1978))). A public entity cannot be held liable under theories of respondeat superior or vicarious liability for violations of § 1983. Woody v. Cronic, 401 F. App'x 509, at *2 (11th Cir. 2010). Rather, a public entity may be sued

11

under § 1983 only where the allegedly unconstitutional action "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers" or where the alleged action is "pursuant to governmental 'custom.'" Monell, 436 U.S. at 690-91.

Plaintiff raises multiple instances of alleged deliberate indifference against the Sheriff. (Am. Compl. ¶¶ 148-57.) He alleges that the Sheriff: knew that Corizon had a pattern of abuse at the jail; failed to train, supervise, or discipline corrections officers to ensure they did not violate inmates' constitutional rights; employed corrections officers who were unfit and "endorse[d] a code of silence at the Jail" (id. ¶ 150); knew that some corrections officers responded to inmates with medical issues using violence, resulting in a history of inmate injury and death; short-staffed the jail "so that jail officers were over-stressed and more likely to act violently and were less fully supervised" (id. ¶ 154); "turned a blind eye toward unqualified or marginally [] qualified officers who pick fights with inmates or use disturbances as training opportunities or opportunities to take out work-related frustrations" (id. ¶ 155); and ignored "acts of gratuitous violence" by corrections officers; and failed to train corrections officers that "long, repeated Taser shocks were associated with inmate deaths, . . . or were not supervised to care about such dangers." (Id. ¶ 157.)

Again, however, Plaintiff has no evidence to support the majority of these contentions. There is no evidence, for example, that officers at the jail had previously responded with violence to inmates with medical issues, and no evidence that these officers caused inmates injury or that the violence resulted in death. And Plaintiff's claim against

the Sheriff requires him to establish a policy or custom.

> A policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality. A custom is a practice that is so settled and permanent that it takes on the force of law.

Sewell v. Town of Lake Hamilton, 117 F.3d 488, 489 (11th Cir. 1997). Plaintiff has no evidence whatsoever of any policy or custom to support his allegations. At most, he points to isolated incidents either long-removed from the incident in question, involving other officers, or involving facilities other than the Charlotte County Jail. His evidence is insufficient to establish any policy or custom.

Plaintiff also contends that the Sheriff may be liable for failure to train corrections officers to respond to a detainee experiencing DT. A claim of inadequate training will lie under § 1983 "where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants [such that the failure to train] can be properly thought of as a city 'policy or custom' that is actionable under § 1983." Sewell, 117 F.3d at 489-90 (quoting City of Canton v. Harris, 489 U.S. 378, 389 (1989)). To establish deliberate indifference on the part of a policy-maker such as the Sheriff, "a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action." Gold v. City of Miami, 151 F.3d 1346, 1350 (11th Cir. 1998). There can be no municipal liability when no pattern of incidents has put the municipal authorities on notice of a need to train. Popham v. City of Talladega, 908 F.2d 1561, 1564-65 (11th Cir. 1990).

13

Plaintiff has no evidence of prior incidents similar to Ireland's situation. Thus, there was no deliberate indifference, and Plaintiff's failure-to-train claim against the Sheriff must be dismissed.

### 2. Wrongful Death

Plaintiff also seeks to hold the Sheriff liable under state law for wrongful death. This is a negligence claim, contending that the Sheriff negligently trained, supervised, hired, retained, and disciplined corrections officers, resulting in Ireland's death. Plaintiff also asserts that the Sheriff "did not ensure that there was a comprehensive plan for prisoners suffering substance withdrawal" or a plan "for timely emergency transport of medically needy prisoners to a hospital." (Am. Compl. ¶¶ 178-79.)

But as noted above, Plaintiff has no evidence regarding any negligent failure to train and offers no additional evidence of the other alleged failures. Other than arguing that the Sheriff did not have appropriate plans in place, he offers no evidence regarding the procedures the jail actually had in place, how those procedures were inadequate, and most importantly, how any such allegedly deficient procedure caused Ireland's death. Indeed, no expert has testified that any delay in getting Ireland to the hospital caused his death. Plaintiff's state-law claim against the Sheriff fails.

### C. Corizon's Motion

### 1. § 1983

A claim against Corizon and the individual Corizon Defendants (Gonzalez-Figueroa, Bracy, and Heavener) under § 1983 requires Plaintiff to establish that these Defendants were deliberately indifferent to Ireland's serious medical needs. Thus, he

14

"must show an objectively serious medical need and show that 'the prison official's response to that need was poor enough to constitute an unnecessary and wanton infliction of pain.'" Fields v. Corizon Health, Inc., 490 F. App'x 174, 182 (M.D. Fla. 2012) (quoting Bingham v. Thomas, 654 F.3d 1171, 1176 (11th Cir. 2011)). Under the principles espoused in Monell, Corizon can be liable for deliberate indifference only if its custom or policy caused the constitutional injury. Id. "A policy may be deliberately indifferent if it is facially unconstitutional or where the policy is implemented 'with deliberate indifference as to its known or obvious consequences.'" Id. (quoting McDowell v. Brown, 392 F.3d 1283, 1291 (11th Cir. 2004) (quotations omitted)).

Plaintiff raises several policies or practices that he contends constitute deliberate indifference as to Corizon. He claims that inmate screening and intake were constitutionally inadequate, that Corizon staff at the jail routinely failed to give inmates required medication, that medical records were inadequate or routinely falsified, that Corizon failed to have a full-time physician on staff at any of its jails, that Corizon routinely short-staffs its jails, and that Corizon knew or should have known that all of its cost-cutting measures—short-staffing, not having a physician on staff, and using LPNs rather than RNs—would lead to adverse outcomes such as Ireland's death.

But as Corizon points out, Plaintiff has little evidence of these supposed policies or practices. Indeed, he has no evidence that there was a policy or practice of inadequate intake screening at the jail, or that medical records were inadequate or falsified. He notes that Defendant Heavener changed the time in a progress note on Ireland's chart from 4:00 am to 3:20 am. But this change reflected the actual time of the incident, rather than the

15

time Heavener filled out the chart. And even if the time change was improper, a single instance does not evidence a policy or practice so widespread as to give rise to <u>Monell</u> liability. Nor does Plaintiff have evidence of a policy of short-staffing the Charlotte County Jail in particular, or that there was cost-cutting at the jail. His evidence in this regard consists solely of criticisms of Corizon's policies in other prison systems, not in the Charlotte County Jail. His § 1983 claims based on these alleged policies must be dismissed.

Plaintiff's contention that Corizon did not give inmates medication relies almost solely on a newspaper investigative series regarding medical complaints at the jail. (Pl.'s Opp'n Mem. (Docket No. 94) at 11 n.9.) This investigative series included an article contending that jail medical staff, and specifically two physicians not involved in this case, did not give several inmates their prescription mental health medication. <u>Inmates say they were denied medical care</u>, Port Charlotte Sun, July 8, 2019, https://www.yoursun.com/charlotte/news/inmates-say-they-were-denied-medicine/article_90b7f5ce-66c4-11e9-acc9-ff8aa6e6dcd6.html (last visited Dec. 30, 2019). Another article in the series noted that Ireland died after allegedly not receiving required medication.

But even if a newspaper article was admissible evidence, it does not establish any custom or practice sufficient to impose liability under <u>Monell</u>. This is a purposely high bar. <u>Gold</u>, 151 F.3d at 1351 n.10. Thus, a claim that a policy or custom is unconstitutional must show that the custom or policy is "a practice . . . so settled and permanent that it takes on the force of law." <u>Sewell</u>, 117 F.3d at 489. An allegedly unconstitutional policy or custom must be "a persistent and wide-spread practice" that may be "attributed to the

governing body of the [corporation]." Depew v. City of St. Marys, 787 F.2d 1496, 1499 (11th Cir. 1986). And a § 1983 plaintiff must have "proof that a specific policy caused a particular [constitutional] violation." Gold, 151 F.3d at 1351 n.10. Plaintiff does not have the requisite proof here: he can point to no other instance where the failure to give an inmate a medication such as potassium caused the inmate to experience a medical emergency. Corizon's Motion as to Plaintiff's § 1983 claims is granted.

Similarly, Plaintiff has no evidence that any of the individual Corizon Defendants ignored Ireland's objectively serious medical need. He argues that intake and screening were inadequate, but none of the individual Defendants was involved with the intake and screening, so these Defendants were not on notice of any issue regarding Ireland's health. And Gonzalez's decision to do a blood test before giving Ireland the prescribed potassium was based on her medical opinion and does not constitute deliberate indifference.

Plaintiff is correct that Ireland had an objectively serious medical need on August 24, when Defendants Heavener and Bracy became involved. He contends that their failure to have Ireland transported to the hospital for more than an hour after the altercation began was deliberate indifference. But he acknowledges that, during that hour, Heavener and Bracy were attempting to reach Gonzalez on the phone. This is not deliberate indifference. The fact that Gonzalez did not answer the phone cannot make Heavener and Bracy liable. Plaintiff's § 1983 claims against the individual Corizon Defendants must be dismissed.

### 2. Wrongful Death

Corizon argues that Plaintiff's claim against it for alleged negligence is a medical negligence claim that, under Florida law, requires pre-suit notice, among other

17

prerequisites. Fla. Stat. § 766.106(2). Plaintiff did not provide the required pre-suit notice. He argues that the claim is one for simple negligence, but the cases he cites do not support this argument. Rather, it is clear that a negligence claim against a medical provider for either failing to provide medical care or providing inadequate care is a medical negligence claim that falls within the ambit of Florida's medical-malpractice statute. See id. § 766.106(1)(a) (The presuit screening requirements apply to any claim "arising out of the rendering of, or the failure to render, medical care or services.") Because Plaintiff did not comply with the statute's requirements, his negligence claim against Corizon must be dismissed.

**CONCLUSION**

Plaintiff has failed to come forward with evidence sufficient to raise a genuine issue of material fact on any of his claims. Accordingly, **IT IS HEREBY ORDERED that**:

1. The Corizon Defendants' Motion for Summary Judgment (Docket No. 84) is **GRANTED**;

2. The Sheriff's Motion for Summary Judgment (Docket No. 85) is **GRANTED**; and

3. Defendant Deputies' Motion for Summary Judgment (Docket No. 86) is **GRANTED**.

**The Clerk shall enter judgment accordingly, terminate all remaining deadlines as moot, and close the file.**

Dated:  January 23, 2020

                                               *s/Paul A. Magnuson*
                                               Paul A. Magnuson
                                               United States District Court Judge